UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 0864 0:13CR00222-001 (MJD)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>v.<br><br>SAYNAB ABDIRASHID HUSSEIN,<br><br>　　　　Defendant. | ▬▬▬▬▬▬▬▬▬<br><br>SAYNAB HUSSEIN'S<br>POSITION REGARDING<br>SENTENCING |

Pursuant to Local Rule 83.10(e) of the Local Rules for the District of Minnesota, Defendant Saynab Abdirashid Hussein, by and through her attorneys, John W. Lundquist and Dulce J. Foster, respectfully submits the following Position Pleading Regarding Sentencing and the Presentence Investigation Report dated November 19, 2013 ("PSR").

## FACTUAL SUMMARY

### I.　MS. HUSSEIN'S PERSONAL HISTORY

Ms. Hussein was born in Somalia, but she does not remember living there because she left the country at the age of one, when her family fled to a refugee camp in Kenya. (PSR ¶ 89.) Her childhood was difficult by any standard. Poverty is universal in refugee camps, but the conditions were particularly difficult for Saynab because her father left the family and her mother became the sole provider. (Id.) They had no electricity or running water, and on some days they had no food to eat. (Id.)





In 1999, when she was 10 years old, Ms. Hussein immigrated with her family to Minnesota. As may be expected, she struggled with language and cultural barriers when she arrived. (PSR ¶ 90.) She attended Roosevelt High School, and graduated in 2008. (PSR ¶ 99.)

After graduation, Ms. Hussein attended nursing school in St. Paul for approximately one year. (Id.) In October 2009, she was married in a traditional Muslim ceremony to Abbas Omar, and then relocated with him to Nashville, Tennessee. (PSR ¶ 92.) Since moving to Nashville, she has continued her education and is currently enrolled as a part-time nursing student at the Nashville State Community College. (PSR ¶ 99.)

Ms. Hussein and Mr. Omar have one child, Ridwaan, who was born in May 2011. (PSR ¶ 92.) ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

[redacted]

## II. HISTORY OF THE CASE

Ms. Hussein attended Roosevelt High School in Minneapolis, where some of the boys who subsequently left Minnesota for Somalia also attended school. Sometime in 2007 or early 2008, while she was still a high school student, Ms. Hussein received a telephone call from one of Ahmed Ali Omar ("Mustaf"), whom she knew from school. During the call she asked him where he was. He said he was in Somalia, but kept changing the subject and was vague about why he was there. Instead, he told her to ask another boy from school, Mohamed Abdullahi Hassan ("Miski"), about what was going on. Ms. Hussein approached Miski about the call. After some hesitation, he told her that the Ethiopians had invaded Somalia, they were raping women and killing children, and they were desecrating the Koran. He said people were angry about this and wanted to stop them.

Miski then asked Ms. Hussein if she wanted to help, and introduced her to his sisters, whom she knew from the mosque. She began spending time with them and eventually joined them and a few other girls in raising a very modest amount of money (approximately $1,300) to help Miski buy a ticket to travel to Somalia and fight against the abuses she had heard and believed the Ethiopians were inflicting on Somali women and children. Ms. Hussein had never heard of "Al Shabaab" and did not learn until later that Miski and Mustaf were associated with that organization.

Ms. Hussein married and moved to Nashville in the October 2009, and her life changed dramatically as a result. She no longer had any significant involvement with the circle of friends who had been communicating with the boys in Somalia. She recalls participating in one conference call with the girls in Minnesota and one or more of the boys from Somalia after her move, but has since cut off communications with them entirely. The Somali community in Nashville is against Al Shabaab and not as fundamentalist as the community in Minnesota.

On June 16, 2009, Ms. Hussein testified before a Grand Jury in connection with the government's investigation of boys traveling from Minnesota to Somalia. During her testimony she denied knowledge of anyone raising money for individuals traveling from Minnesota to Somalia to fight against Ethiopian troops. Ms. Hussein admits that this statement was not truthful. On August 29, 2013, Ms. Hussein pleaded guilty to perjury in violation of 18 U.S.C. § 1623(a). She feels very remorseful about her actions and has accepted responsibility for them.

## SENTENCING ANALYSIS

Ms. Hussein requests a sentence that is guided by the considerations set forth in 18 U.S.C. § 3553(a). The core requirement of Section 3553(a) is that the Court impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing. 18 U.S.C. § 3553(a).

In *Rita v. United States*, the Supreme Court instructed courts to begin determining a defendant's sentence by calculating the applicable range under the Sentencing Guidelines. 127 S.Ct. 2456, 2465 (2007). The Guidelines are not binding, however—

merely advisory. *United States v. Booker*, 543 U.S. 220, 245 (2005). After calculating the applicable Guidelines range, a court must also take into account each of the seven factors articulated in 18 U.S.C. § 3553(a). *Rita*, 127 S.Ct. at 2456.

Courts are not required to afford the Guidelines any greater weight than any other sentencing factor. *Booker*, 543 U.S. at 259-60. Rather, the sentencing factors allow a court to consider a broad range of circumstances in fashioning a sentencing. *See Gall v. United States*, 128 S.Ct. 586, 598 (2007) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.").

Ms. Hussein contests the sentence recommended in the PSR, both on the ground that it reflects errors in the application of the Sentencing Guidelines, and on the ground that it does not satisfy the statutory mandate to impose a sentence sufficient "but not greater than necessary" to satisfy the purposes of sentencing.

I.  **SENTENCING GUIDELINES CALCULATION**

   A.  <u>Ms. Hussein had no involvement in most of what the PSR describes as the "Offense Conduct".</u>

Under the heading "Offense Conduct," the PSR contains approximately seven pages of information describing conduct of which Ms. Hussein had no knowledge and in which she did not participate. She was not even aware of the existence of Al Shabaab initially, and had no understanding of its tactics or goals. She did not know that Al Shabaab was targeting the Transitional Federal Government of Somalia (PSR ¶ 28), or

that the boys she knew from high school were joining a fight against that government. She did not know that Al Shabaab had harassed and assassinated "[transitional government] leaders, military targets, aid workers, civilians and journalists"; that it had used "improvised explosive devices, rockets, mortars, automatic weapons, and general tactics of intimidation and violence to undermine the transitional government"; disseminated propaganda, including a video of a decapitation; or carried out multiple suicide bombings. (PSR ¶¶ 29, 32.) Ms. Hussein did not know that Al Shabaab's goal was to impose an "extreme version" of Sharia law throughout Somalia. (PSR ¶ 30.) She was not aware that the United States designated Al Shabaab as a foreign terrorist organization in Febraury 2008 or that a spokesman for the organization had declared that designation "a badge of honor." (PSR ¶ 31.) She was not even acquainted with most of the boys who left Minnesota to travel to Somalia.

What Ms. Hussein understood and believed was that a group of boys from Minneapolis was raising money to travel to Somalia so they could protect Somali women and children from abuses by Ethiopian troops who had invaded the country. To describe the tactics and goals of Al Shabaab as a part of her "offense conduct" is not at all accurate.

### B. The Underlying Offense is Expedition Against a Friendly Nation.

The PSR recommended a total offense level of 36 based on the conclusion that the "underlying offense" for purposes of the cross-reference under USSG §§ 2J1.3(c) and 2X3.1 is "conspiracy to commit murder" (which has a base offense level of 33, USSG § 2A1.5). This calculation includes a base offense level of 27 (33-6, pursuant to § 2X3.1),

a victim related adjustment of +12 (under USSG 3A1.4(a)), and adjustments of -2 and -1 for acceptance of responsibility (under USSG §§ 3E1.1(a) and 3E1.1(b)).[1]

Because Ms. Hussein had no understanding that the boys traveled to Somalia to fight for a terrorist organization involved in assassinating innocent civilians, the designation of the underlying offense as "conspiracy to commit murder" is not appropriate. Instead, conspiracy to violate the U.S. Neutrality Act ("expedition against a friendly nation," 18 U.S.C. § 960), is a much more fitting cross-reference in this case. The Neutrality Act provides:

> Whoever, within the United States, knowingly begins or sets foot or provides or prepares a means for or furnishes the money for, or takes part in, any military or naval expedition or enterprise to be carried out from thence against the territory or dominion of any foreign prince or state, or any colony, district, or people with whom the United States is at peace, shall be fined under this title or imprisoned not more than three years, or both.

Taking part in a military exercise against Ethiopian troops, when the United States was at peace with Ethiopia, precisely fits the elements of this offense.

Based on a determination that the Neutrality Act defines the underlying offense, Ms. Hussein's base offense level is 14. Perjury has a base offense level of 14 under USSG 2J1.3. Since there is no Guideline range for offenses under 18 U.S.C. § 960, and no analogous offense Guideline, there is no cross-reference that would result in a base

---

[1] It is our understanding that these adjustments have become "boilerplate" in virtually all of the prosecutions related to Minnesota Somalis traveling to Somalia.

offense level greater than 14. Her base offense level thus remains at 14. (USSG § 2J1.3(c)(1)).

Furthermore, the "terrorism adjustment" under USSG § 3A1.4(a) does not apply. That adjustment only applies if the underlying offense of conviction is listed in 18 U.S.C. § 2332b(g)(5). Violating the Neutrality Act is not included in this list of offenses.

Ms. Hussein agrees with the finding in the PSR that she is entitled to a downward adjustment of -2 for acceptance of responsibility under USSG § 3E1.1(a).[2] Starting with a base offense level of 14 and including this adjustment yields a total offense level of 12.

Finally, because Ms. Hussein's offense did not involve and was not intended to promote a federal crime of terrorism, the criminal history adjustment under USSG § 3A1.4(b) does not apply, and her criminal history score is zero. Given a total offense level of 12 and a criminal history score of zero, Ms. Hussein has a Guideline sentencing range in Zone C of 10-16 months.

### C. A Downward Departure is Appropriate Under USSG § 4A1.3(b) because the Criminal History Score Calculated in the PSR Substantially Over-represents the Seriousness of Ms. Hussein's Criminal History.

Assigning Ms. Hussein a criminal history score of VI as recommended in the PSR dramatically overstates the seriousness of her criminal history. Ms. Hussein's criminal record was spotless until she became involved in the events at issue in this case. She values her religion, but she is not a radical fundamentalist, and has never knowingly

---

[2] The PSR recommended -3, but she is eligible only for -2 as her base offense level is less than 16. USSG § 3E1.1(b).

supported terrorism. At the time of her involvement, she was very young and impressionable, and—as a result of her troubled home life—desperately in need of the support of her peers. Since then she has grown up significantly, married, become a mother, moved away from home, and severed her ties with the community of peers who influenced her to become involved.

Assigning her a criminal history score that exceeds that of career criminals would be unjust. Because a criminal history score of VI substantially over-represents the seriousness of her conduct and the likelihood of recidivism, a downward departure under USSG § 4A1.3 is warranted if the Court finds that the adjustment under USSG § 3A1.4(b) is applicable. *See United States v. Meskini*, 319 F.3d 88, 92 (2nd Cir. 2003) (holding, "A judge determining that § 3A1.4(b) over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' always has the discretion under § 4A1.3 to depart downward in sentencing.").

**D.    A Downward Departure is Appropriate under USSG § 5K1.1 because Ms. Hussein has Provided Substantial Assistance to Authorities.**

On August 19, 2012, Ms. Hussein met with agents from the FBI and prosecutors from the United States Attorney's Office and provided information about her conduct and the conduct of others involved. In exchange for her assistance, the government has agreed to move for a downward departure at the time of her sentencing under USSG § 5K1.1. The government has recommended a cap of 24 months.

As discussed in Section B above, Ms. Hussein's true Guideline range is 10-16 months, since the Neutrality Act provides a far more accurate description of the

underlying offense than "conspiracy to murder." Taking her cooperation into consideration, the Court should depart downward from the 10-16 month, Zone C Guideline range, and sentence her to a probationary sentence.

> E. **A Downward Departure is Warranted under USSG § 5K1.2 because there are mitigating circumstances of a kind and degree not adequately taken into consideration in the Guidelines.**
>
>> 1. **Imposing a Guideline sentence as calculated in the PSR likely would result in Ms. Hussein's deportation and the destruction of her family.**

Ms. Hussein is a legal permanent resident of the United States. (PSR at F.2.) She applied for citizenship and was on the verge of attaining that status, but her citizenship interview was canceled, upon information and belief, because of this case. As a result, her conviction puts her at risk of potential deportation to Somalia—a country in which she has not resided or even visited since she was 1 year old.

The government once avoided deporting Somalis to Minnesota because it was deemed inappropriate to send someone to an unsafe and unstable country that lacked any functioning government. Although Somalia is still extremely unsafe and unstable, and many view deportation there as a potential death sentence, the government's policy against deporting people to Somalia has changed. According to a September 2013 article in the *Minneapolis Star Tribune*, "The federal government is engaging in an aggressive effort to deport Somali immigrants who run afoul of U.S. law, after refraining for years from shipping people back to a country wracked by civil war and lacking a functioning government." *See "Feds Step Up Deportations of Somalis in Trouble in Minnesota,"* Sept. 21, 2013, http://m.startribune.com/news/?id=224729142&c=y.

The offense of perjury is defined as an "aggravated felony" under the Immigration and Nationality Act ("INA") if the term of imprisonment imposed is at least one year. 8 U.S.C. § 1101(a)(43)(S). If the Court sentences Ms. Hussein to 365 days or more in prison, she will stand convicted of an aggravated felony. A conviction for an aggravated felony would allow Immigration and Customs Enforcement to place Ms. Hussein in mandatory custody upon the completion of her criminal sentence, and to initiate deportation proceedings against her.

If, in contrast, Ms. Hussein is sentenced to a term of less than 365 days in prison, she will stand convicted of a "crime of moral turpitude," but not an aggravated felony. Under the INA, such a conviction would not make her deportable because she has lived in the United States for more than five years. 8 U.S.C. § 1227(a)(2)(A)(i).

Deportation to Somalia in Ms. Hussein's case is a punishment that would far outweigh the crime committed here.[3] She has no knowledge of Somalia, would have no way to support herself there, and would very likely live in severe poverty. Her goal of obtaining a nursing degree would be derailed. She would also face threats to her health and safety arising from the lack of medical care and the continuing instability in Somalia. Moreover, her willingness to cooperate with the government's investigation and provide information against people who are still in Somalia fighting on behalf of Al Shabaab would expose her to a very real and significant risk of retaliation if discovered.

---

[3] The irony of deporting her to Somalia because of her participation in helping others travel to Somalia is difficult to escape.

Finally, Ms. Hussein's common law husband and child are both United States citizens. She could not bring them with her to Somalia, and even if she did, she would expose them to the same risks to their health, safety and lives. Her family would literally be destroyed. Ridwaan is now 2½ years old. Ms. Hussein has been his primary caregiver since his birth, and the damage such a separation would cause to him is immeasurable.

The Sentencing Guidelines permit a downward departure based on a defendant's family ties and responsibilities if:

- The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking…to the defendant's family.;
- The loss of caretaking … substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant.;
- The loss of caretaking … is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking … irreplaceable to the defendant's family.; and
- The departure effectively will address the loss of caretaking or financial support.

(USSG § 5H1.6, Application Note 1(B).)

Each of these elements is met in this case. If Ms. Hussein is deported, Ridwaan will not only lose the support and care of his mother during any term of imprisonment, but could lose her permanently—a harm that is not typically incident to sentencing for perjury. The emotional bond that child has with his mother is irreplaceable. Moreover, a downward departure to less than 365 days in prison would mitigate this risk by making her non-deportable under U.S. immigration law.

The Court is permitted to consider Ms. Hussein's immigration status in reaching a departure decision. *United States v. Lopez-Salas*, 266 F.3d 842, 847 (8th Cir. 2001) ("As a factor unmentioned in the guidelines, alien status and the collateral consequences

flowing therefrom may be an appropriate basis for departure.") Under USSG § 5H1.6, the Court should consider Ms. Hussein's family ties and the impact a sentence to an aggravated felony would have on her immigration status, and sentence her to a term of less than 365 days.

    2. <u>Ms. Hussein's youth at the time of the offense prevented her from appreciating the consequences of her actions.</u>

"Age (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." USSG § 5H1.1.

Ms. Hussein was a teenage girl still in school when she was drawn into the group of peers who were involved with the boys traveling to Somalia. ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████. At the time of her testimony before the Grand Jury she was still living at home, just out of high school, and very scared.

Since that time she has become an adult. She is no longer a teenage girl seeking acceptance from her peers, but a wife and mother. She is successfully working towards establishing a career in the nursing profession. (*See* PSR ¶ 99, confirming her enrollment and current GPA of 3.88.) She no longer lives in Minnesota and does not routinely associate with the same group of peers. Her change in circumstances prevents the possibility of any recurrence of the conduct at issue in this case.

Furthermore, Ms. Hussein now works to help others in her community in Nashville. She volunteers to help her friends, neighbors and family by giving them rides, caring for their children and helping their children with homework. She tutors and mentors the girls in her community, takes them on field trips, and leads a book club for girls in junior high and high school. She volunteers her time at the local mosque and encourages the girls she mentors to help clean the mosque and surrounding areas. Her friends and relatives describe her as kind, compassionate, generous and nurturing; as a hard worker who strongly promotes education and encourages others to educate themselves; as a devoted mother and loving wife; and as someone who loves the United States and appreciates everything this country has to offer. Ms. Hussein's compassionate character and her contributions to the community are described in the numerous letters of support her friends and family have written, which will be submitted for the Court's consideration.

While these facts do not excuse her conduct, they take her case out of the heartland of perjury cases. The District Court in *Gall v. United States* issued an opinion including a footnote later cited by the Supreme Court, stating:

> Immaturity at the time of the offense conduct is not an inconsequential consideration. Recent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five. . . . [T]he recent [National Institutes of Health] report confirms that there is no bold line demarcating at what age a person reaches full maturity. While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant.

*Gall v. United States,* 552 U.S. 38, 58 (2007). Ms. Hussein's youth at the time of the offense and the changes she has made to her life since then support a downward

departure. *Id.* (holding that it "was not unreasonable for the District Judge to view [the defendant's] immaturity at the time of the offense as a mitigating factor, and his later behavior as a sign that he had matured and would not engage in such impetuous and ill-considered conduct in the future).



## II. THE 18 U.S.C. § 3553(a) FACTORS SUPPORT A DOWNWARD VARIANCE.

In addition to the Sentencing Guidelines and any limits imposed by statute, the Court must take into account the other sentencing factors set forth in 18 USC § 3553(a) in its determination of a sentence that is "sufficient but not greater than necessary" to comply with the purposes of sentencing. These factors include:

- the nature and circumstances of the offense and the history and characteristics of the defendant;

- the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
- the need to afford adequate deterrence to criminal conduct;
- the need to protect the public from further crimes of the defendant;
- the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
- the need to avoid unwanted sentencing disparities; and
- the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The above factors weigh in favor of imposing a probationary sentence. First, the Court must consider the nature and circumstances of the offense and the history and characteristics of the defendant. These factors are discussed in significant detail in the previous section of this Position Pleading and, as discussed in Sections I(B) and I(D) above, a probationary sentence is appropriate.

Next, the Court considers the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. As discussed in Section I(E)(1) above, any sentence greater than 364 days would subject Ms. Hussein and her family not only to a term of imprisonment, but to the far more severe and significant risk that she will be deported to Somalia, face risks of retaliation from the boys she cooperated against, and have to leave her family behind. The ends of justice will not be served by sentencing Ms. Hussein and her family to this fate.

Giving Ms. Hussein a probationary sentence would not undermine the need to deter crimes of perjury. A review of Court records available through ECF indicates that only four cases of perjury have been charged in this District during the last 10 years, including this one. (A fifth case was handled in this district via transfer after sentence

was imposed.) The small number of perjury cases charged during that time period suggests that perjury is either not rampant or not a high prosecution priority, such that the need for deterrence is relatively low.

Furthermore, as discussed in Sections I(C) and I(E)(2), Ms. Hussein's change in circumstances during the last several years makes the likelihood of a recurrence extremely low, and Ms. Hussein has no other criminal record. The need to protect the public from further crimes of the defendant is not a significant factor in this case.

The need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment weighs in favor of imposing a probationary sentence. Ms. Hussein's nursing education will be disrupted if she is sentenced to a term of imprisonment. ████████████████████████████████████████
████████████

As to avoiding sentencing disparities, as noted above, a search of the ECF system indicates there are Court records for only four Defendants charged with perjury in this District in the last 10 years (plus one additional case handled in Minnesota via transfer). They are as follows:

- *United States v. Stallone, et al.*, 04-CR-000176 (DSD/SRN), in which the defendant, Shari Cruz, had the perjury charged dismissed based on a plea to a count of blackmail and was sentenced to probation;
- *United States v. Hughson*, 07-CR-00051 (DSD/RLE), in which the defendant was acquitted;
- *United States v. Ali*, 09-CR-00317 (MJD), in which the defendant was sentenced to 24 months;

- *United States v. Said*, 13-CR-00031 (JRT), transferred to this District from the Middle District of Tennessee, in which the defendant was sentenced to time served (which turned out to be approximately 15 months); and
- This case.[4]

Based on this research, the most time that any defendant has received on a charge of perjury in the last ten years in this district is 24 months, and others have received substantially less than that.

The *Ali* case involved a defendant who was sentenced based on false testimony concerning his involvement with transporting some of the boys who were bound for Somalia to the Minneapolis Airport. Although it also relates to the investigation of boys leaving for Somalia, as discussed above, Ms. Hussein's age, immigration status, family ties and rehabilitation, differentiate her case from *Ali*. Moreover, the Court should note that in similar case involving the same investigation, *United States v. Abdow*, 09-292 (MJD), the defendant was sentenced to 120 days imprisonment and 120 days home confinement on a count of obstruction of justice.

The final sentencing factor is restitution. This factor should have no bearing on Ms. Hussein's case as no victims have been identified.

## CONCLUSION

For the foregoing reasons, the Court should calculate Ms. Hussein's sentencing range under the Guidelines as 10-16 months, and depart downward to a probationary

---

[4] It is interesting to note that, of the five perjury cases brought in this District in the last 10 years, three have involved defendants of Somali origin. Neither of the cases involving non-Somali defendants resulted in a term of imprisonment.

sentence based on her cooperation with the government.  Ms. Hussein further requests a downward variance based on the sentencing factors set forth in Section 3553(a).

Dated: <u>December 13, 2013</u>     <u>s/ John W. Lundquist</u>
John W. Lundquist (#65286)
Dulce J. Foster (#285419)
FREDRIKSON & BYRON, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Telephone:  (612) 492-7000
Fax:  (612) 492-7077

**ATTORNEYS FOR DEFENDANT
SAYNAB ABDIRASHID HUSSEIN**

20416948_1.docx